```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA


PNC BANK, NATIONAL ASSOCIATION, :    CIVIL ACTION
Trustee of the Harold G. Fulmer,:
III Irrevocable Deed of Trust   :
Dated 8/21/97                   :
                                :
           v.                   :
                                :
AMERUS LIFE INSURANCE COMPANY   :    NO. 05-02966-JF
```

ADJUDICATION

Fullam, Sr. J.                                          July 17, 2006

This case was tried non-jury on June 26 and 27, 2006. My findings and conclusions are summarized below. There is, actually, little or no dispute as to the facts. Counsel for plaintiff has submitted 180 proposed findings of fact, together with 151 proposed conclusions of law – a remarkable number, until one notes that counsel appears to have simply submitted a legal brief, with each sentence constituting a separate, numbered paragraph. Defense counsel has submitted a more modest total of 44 proposed findings of fact, and 14 proposed conclusions of law.

The relevant facts can be stated briefly. In 1987, a gentleman named Harold G. Fulmer, III purchased a $10 million life insurance policy from the defendant (Policy Number 2535113), and immediately transferred ownership of the policy to a trustee, under a life insurance trust created pursuant to an irrevocable deed of trust dated August 21, 1987. In 1999, plaintiff PNC Bank, National Association became the successor trustee under

that arrangement.  At all relevant times, plaintiff had a copy of the life insurance policy in its files, and the defendant had a copy of the trust agreement in its files.

Under the terms of the trust agreement, Mr. Fulmer was solely responsible for paying premiums on the policy, and the plaintiff, as trustee, did not even have a duty to keep Mr. Fulmer informed as to premiums due.  On the other hand, under the terms of the insurance policy, the defendant insurance company did not have any stated obligation to communicate with Mr. Fulmer either; it was required to send notices to the owner of the policy, the plaintiff bank.  And, since the defendant had a copy of the trust agreement in its files, defendant was presumably chargeable with notice that the bank might not be notifying Mr. Fulmer about premiums due.

These technical problems are not addressed by counsel in their arguments, presumably because of the way in which the parties conducted their relationships over the years, and particularly since plaintiff became the trustee in 1999.  The defendant sent all premium notices, annual statements, and other documentation relating to the policy to the bank.  Most of these communications were addressed to Mr. Fulmer in care of the bank, but directed to the attention of specific individuals at the bank.  The Fulmers communicated principally with the bank, rather than directly with the insurance company, but occasionally dealt

directly with the insurance company.  And the bank endeavored to keep Mr. Fulmer informed about all premium notices and other significant events.

The insurance policy in question was a "variable premium" policy.  The premiums had to be calculated by the insurance company, and increased over time, as Mr. Fulmer's age increased, and as pertinent interest rates changed.  The defendant was solely responsible for calculating the appropriate premium, which depended heavily upon the "cost of insurance" factor which varied with age, as noted above.

Under the terms of the policy, Mr. Fulmer had the right either to pay premiums periodically, or to cause the cash surrender value of the policy to be used to pay premiums.  In conformity with this right, the policy included the following provisions:

> "Grace Period.  This policy will stay in force for 60 days after the monthly due date on which the cash value is not sufficient to cover the monthly deductions then due....
>
> Lapse.  If sufficient premium is not paid by the end of the grace period, the policy and any additional benefit riders will end without value.  We will mail you notice of the amount of premium that will be sufficient to continue the policy in force at least 30 days before the end of the grace period."

In 1993, Mr. Fulmer formally notified the defendant insurance company (and the trustee) that he wished to use the cash surrender value of the policy, until further notice, to pay

premiums.  He formally requested the insurance company to notify him if the cash surrender value was insufficient to pay premiums at any time in the future.  From then on, as each quarterly payment of premium became due, plaintiff would learn ahead of time from defendant whether premium payments over and above the cash surrender value would be necessary, and would cause Mr. Fulmer to make the necessary payments.  At times, the policy would enter the "lapse" condition, the defendant would issue a lapse notice to plaintiff, and plaintiff would cause Mr. Fulmer to make the necessary payments.

All inquiries addressed to the defendant insurance company were handled by its "customer service" representatives. The inquirer would telephone a listed number, would provide the number of the insurance policy, and would thereupon be directed to a specific customer service representative.  The customer service representatives, in turn, had access to the computer files of the defendant, and would provide information to the caller based upon what the computer screen showed.

It should also be noted that the defendant's computers caused various notices to be sent out from time to time. Specifically, on each yearly anniversary of the policy, the defendant's computers would generate and distribute an annual statement showing the status of the policy.  Invariably, these statements disclosed (in small print at the end) that, during the

4

following year, it was likely that the cash surrender value of the policy would not suffice to pay all premiums due, and that, unless premiums were duly paid as required, the policy might lapse.

By late 2003, premiums on the Fulmer policy were averaging about $25,000 per quarter, $100,000 per year. By the end of 2003, some entries in the defendant's computer records could give the impression that the cash surrender value of the Fulmer policy should be sufficient to pay the premiums. Actually, however, because cash surrender value was the amount which would remain after deduction of a "cancellation fee" of about that amount, there was little or no cash surrender value in the Fulmer policy by the end of 2003.

One inquiry of the defendant yielded the information that a payment of $511.04 would suffice to keep the policy in force for three more months – until on or about March 23, 2004. Mrs. Fulmer promptly paid that amount.

The development which I regard as crucial occurred on February 11, 2004, when the bank's representative, Ms. Allen, telephoned the defendant's customer service representative, Ms. Mincks, to clarify the premium situation, and was assured that the payment which had just been made was "sufficient to pay premium payments for three months" and that the "current cash value" was $25,238.67. As was her custom, Ms. Allen made a

written record of this conversation at the time.  Her testimony on this subject is not contradicted in any way.

It is now clear that Ms. Allen was given incorrect information, but there can be no doubt that, had the correct information been furnished, the Fulmers would have made whatever premium payment was required.  The defendant calculated that the policy entered a lapse period as of February 23, 2004.  In March 2004, the defendant sent a "late payment offer" to the bank, suggesting that a payment of $24,268.51 would be required; actually, a payment of approximately $16,000 should have been sufficient.

Representatives of the bank, upon being notified that the policy had allegedly lapsed, sought clarification from the defendant, but were told that, since the policy had terminated, the customer service representatives could no longer obtain the pertinent information from the computer system.

Mr. Fulmer availed himself of the right conferred by the insurance policy to seek reinstatement after the policy had lapsed.  Unfortunately, because he was determined to be then uninsurable, the defendant refused to reinstate the policy.

During the period from 1987 to the cancellation of the policy, Mr. Fulmer had paid the defendant approximately $1.5 million in premiums.  It is very clear, and undisputed, that neither the plaintiff nor the Fulmers had any intention of

allowing the policy to lapse.  Mr. Fulmer had ample funds available with which to pay premiums.  His decision to use cash surrender values to offset premiums was based upon investment considerations, not lack of funds.

My conclusions of law are straightforward: but for the incorrect information supplied to plaintiff by the defendant's customer service representatives, the premiums would have been paid and the policy would not have lapsed.  The defendant cannot lawfully cancel the policy for nonpayment of premiums, when the defendant itself was responsible for the default.  Aetna Cas. & Surety Co. v. Netz, 1993 WL 89766 (E.D. Pa. Mar. 29, 1993); Amrovcik v. Metro. Life Ins. Co., 180 A. 727 (Pa. Super. Ct. 1935).  The defendant was legally obliged to act in good faith. Huang v. BP Amoco Corp., 271 F.3d 560 (3d Cir. 2001); Dercoli v. Pennsylvania Nat'l Mut. Ins. Co., 554 A.2d 906 (Pa. 1989).

### Non-Issues

It is appropriate to mention briefly certain additional contentions made by the parties.  Defendant made the remarkable argument that this court was without subject matter jurisdiction over the controversy because, some years ago, as the result of a class action, the defendant was found to have overcharged all of its customers, and was required to make modest refunds to all policy-holders who were members of the class, including the Fulmer policy.  A court in California reserved jurisdiction to

enforce the settlement, and the settlement included providing defendant a general release.  Contrary to defendant's present argument, I am satisfied that neither the final judgment, nor the terms of the releases, could reasonably be interpreted as barring this court's jurisdiction, or as barring the imposition of liability for additional, unrelated wrongs.

Defendant also argues, strenuously, that, under the express provisions of the insurance policy, only the defendant Board of Directors and other high officials had the right to amend the insurance policy.  That is, of course, true, but plaintiff is not seeking to amend the insurance policy, merely to enforce it according to its terms, and with the implied covenant of good faith and fair dealing.

An Order follows.

```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA


PNC BANK, NATIONAL ASSOCIATION, :    CIVIL ACTION
Trustee of the Harold G. Fulmer,:
III Irrevocable Deed of Trust   :
Dated 8/21/97                   :
                                :
          v.                    :
                                :
AMERUS LIFE INSURANCE COMPANY   :    NO. 05-02966-JF
```

ORDER

AND NOW, this 17th day of July 2006, IT IS ORDERED, ADJUDGED AND DECLARED:

1. That the defendant Amerus Life Insurance Company wrongfully terminated the life insurance policy involved in this case.

2. That the insurance policy in question (Policy Number 2535113, insuring the life of Harold G. Fulmer, III for $10 million) remains in full force and effect, subject only to the conditions set forth in the following paragraph:

3. Defendant shall, within 30 days, calculate the amount of premium, if any, in excess of cash surrender values, which would have been necessary to keep the policy in force until the next premium-due date, and shall promptly inform plaintiff and Mr. Fulmer of the amount due, if any. Such calculation may take into account interest which would have been earned on such premiums during the interval.

4. Within 10 days after notification, Mr. Fulmer shall cause the requisite payments to be made.

5. This court reserves jurisdiction to resolve any disputes which may arise concerning the calculation of premiums and related matters.

BY THE COURT:

/s/ John P. Fullam
John P. Fullam, Sr. J.